**UNITED STATES, Plaintiff, Appellee,**

v.

**Charles JOHNSON, Genelda Johnson, Francis Vaner Johnson, and Johnson Cranberries, LLP, Defendants, Appellants.**

**No. 05–1444.**

United States Court of Appeals, First Circuit.

Heard Oct. 7, 2005.

Decided Feb. 13, 2006.

Malcolm Reed Hopper, with whom Gregory T. Broderick was on brief for appellants.

John L. Smeltzer, with whom Kelly A. Johnson, Acting Assistant Attorney General and Ellen Durkee, Attorney, Department of Justice Environment & Natural Resources Division, were on brief for appellee.

Before TORRUELLA and LIPEZ, Circuit Judges, and DiCLERICO,* District Judge.

LIPEZ, Circuit Judge.

In December 1999, the United States filed a civil action against Defendants, claiming that they had discharged pollutants into federally-regulated waters without a permit in violation of provisions of the Clean Water Act in the operation of their cranberry farm. Defendants challenged the United States' jurisdiction over the properties in question. In separate rulings on liability and remedy, the district court granted summary judgment in favor of the government, reasoning that "there is a sufficient basis for the United States to exercise jurisdiction because the undisputed evidence shows that the three wetlands [the Johnsons' properties] are hydrologically connected to the navigable Weweantic River by nonnavigable tributaries."

Defendants appeal the district court's judgment that the jurisdiction of the Clean Water Act extends to their property. They assert that their property is not covered by the regulation promulgated by the Environmental Protection Agency (the "EPA") in conjunction with the United States Army Corps of Engineers (the "Corps"), to carry out the mandate of the Clean Water Act, as interpreted by EPA and the Corps. In the alternative, if their property is covered by the regulation, Defendants contend that either the regulation exceeds the authority granted by the Act, or the Act exceeds Congress' authority under the Commerce Clause. These contentions require us to determine whether the government's exercise of jurisdiction over the three parcels of land at issue complies with constitutional, statutory, and regulatory requirements. This opinion concludes that it does.

## I.

### A. Standards of Review

Review of a district court's grant of summary judgment is *de novo. Johnson v. Gordon,* 409 F.3d 12, 16 (1st Cir.2005). Review of an agency's interpretation of the statute that it administers is also *de novo,* subject to established principles of deference. *See Perez–Olivio v. Chavez,* 394 F.3d 45, 48 (1st Cir.2005). Constitutional challenges to a statute are also reviewed *de novo. United States v. Lewko,* 269 F.3d 64, 67 (1st Cir.2001).

### B. Procedural Background

The United States (or "the government") brought this action in November 1999 to address alleged violations of the Clean Water Act (the "CWA" or the "Act"), 33 U.S.C. § 1241 *et seq.,* by a group of cranberry farmers—Charles Johnson,

___

* Of the District of New Hampshire, sitting by designation.

Genelda Johnson, Francis Vaner Johnson, and Johnson Cranberries, Limited Partnership (collectively, the "Johnsons" or "Defendants"). It asserted that the Johnsons discharged dredged and fill material[1] into wetlands at three sites in Carver, Massachusetts, without a permit issued pursuant to § 404 of the CWA, 33 U.S.C. § 1344, in violation of § 301(a) of the CWA, 33 U.S.C. § 1311. In February 2004, following extended discovery, the government filed a motion for summary judgment on liability. In May 2004, the district court granted the government's motion, expressly adopting as the bases for its ruling "the arguments set forth in the United States' Memorandum in Support of Its Motion for Summary Judgment on Liability."

██ In November 2004, the government filed a motion for summary judgment on remedy. On January 15, 2005, the district court issued a final order granting the government's motion and ordering the requested relief. On January 27, 2005, the Johnsons filed a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure. In February 2005, the district court issued an order denying the Johnsons' motion, stating that:

> there is a sufficient basis for the United States to exercise jurisdiction because the undisputed evidence shows that the three wetlands are hydrologically connected to the navigable Weweantic River by nonnavigable tributaries.

This appeal followed.[2]

### C. Factual Background

The property at issue involves three sites in Carver, Massachusetts: (1) the Cross Street site; (2) the Fosdick Street site; and (3) the Forest/Fuller Street site (collectively, the "target sites"). These

---

1. Dredged and fill material include dirt, spoil, rock, and sand.

2. The government asserts that Defendants have waived the arguments they now raise on appeal. Specifically, the government argues that in response to its motion for summary judgment on liability, the Johnsons filed only an untimely *pro se* letter. Then, in response to its motion for summary judgment on remedy, the Johnsons did not file any response—only later filing their Rule 59(e) motion for reconsideration. There is no merit in the government's waiver argument.

The untimeliness of Defendants' letter was caused by the withdrawal of Defendants' counsel on the day the response to the government's summary judgment motion was due, which forced Defendants to proceed *pro se* and file a tardy response. The district court never ruled on the timeliness issue. Instead, the district court delayed its ruling regarding liability until after Defendants had submitted their responsive letter. The government never raised a timeliness objection below. Given the circumstances, excuse of the tardiness of Defendants' letter is warranted.

The letter is a four-page, single-spaced document with numerous statements questioning the government's jurisdiction over the property at issue. Defendants properly raised their statutory and regulatory arguments in the letter. As for Defendants' Commerce Clause argument, we have held that "[a]lthough Appellant failed to raise his *Lopez*-based challenge below, a claim that a statute is unconstitutional or that the court lacked jurisdiction may be raised for the first time on appeal." *United States v. DiSanto*, 86 F.3d 1238, 1244 (1st Cir.1996) (referencing *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)). Based on *DiSanto*, Defendants may raise their constitutional challenge on appeal. The government asserts, incorrectly, that *United States v. Bongiorno*, 106 F.3d 1027 (1st Cir.1997)—where we held that the defendant's constitutional challenges to his conviction were subject to the raise-or-waive rule—forecloses this possibility. However, in *Bongiorno*, the constitutional challenges that we found procedurally defaulted were *not* challenges to the statute at issue in that case. Therefore, *Bongiorno* and *DiSanto* are consistent with one another, and *Bongiorno* does not preclude review of Defendants' Commerce Clause argument.

sites are "hydrologically connected" to the Weweantic River, a "navigable-in-fact"[3] waterway that flows south from Carver, Massachusetts, to Wareham, Massachusetts, where it empties into Buzzards Bay and the Atlantic Ocean. "Hydrologically connected" here means that water from the three sites eventually drains into the Weweantic River. Consequently, any pollutants discharged on or from the target sites would reach the Weweantic River through this hydrological connection.

The government introduced the testimony of a number of experts in support of its Motion for Summary Judgment on Liability. These experts had reviewed topographic and other maps, aerial photographs, and EPA reports, and had performed visual inspections to reach their conclusion that the targets sites are hydrologically connected to the Weweantic River. Defendants do not dispute this conclusion; in fact, the government's experts relied on some of the testimony and analysis of Defendants' expert in reaching their conclusion.

As will become apparent later in the discussion, the particular bodies of water that form the connection between the target sites and the Weweantic River are vital to the question of whether the exercise of CWA jurisdiction is valid. Each target site is immediately adjacent to, i.e. connected to, a stream, creek, or ditch; and every wetland, bog, or swamp in the chain of waters connecting the target sites to the Weweantic River is also immediately adjacent to a stream, creek, ditch, or pond.

Defendants do not dispute either the factual descriptions of the target sites or the waters that link the target sites to the Weweantic River. Defendants' arguments on appeal are purely legal.

### 1. The Weweantic River

The Weweantic River is formed by the merging of two brooks: the Rocky Meadow Brook and the South Meadow Brook. Water from the target sites—after it travels through a number of intermediary waters—makes its way into these brooks a short distance before the two brooks join and form the Weweantic. Prior to the Johnsons' actions on the target sites, water from the target sites had surface water (as distinguished from ground water[4]) hydrological connections to the Weweantic River via the Rocky Meadow or South Meadow Brooks.

---

**3.** "Navigable-in-fact" is used to describe a body of water on which navigation, i.e. boat or ship traffic, takes place or could take place. The CWA uses the term "navigable waters" to label waters over which it has jurisdiction, some of which are not navigable-in-fact. Where used in this opinion, "navigable waters" will have the meaning the CWA attributes to it: waters over which federal regulatory jurisdiction extends. As further discussed below, "waters of the United States" is synonymous with "navigable waters" in this usage.

**4.** Ground water is defined as water beneath the earth's surface, often between saturated rock and soil. See, e.g., 10 C.F.R. § 63.302 ("Ground water means water that is below the land surface and in a saturated zone."). This is the type of water that typically supplies wells and springs. By contrast, surface water is water found on the soil's surface, i.e. all water that is not ground water. Wetlands are a type of surface water.

The CWA does not cover any type of ground water; the CWA covers only surface water. Nothing in the terms of the CWA or the regulation at issue here interpreting the CWA could be construed as extending jurisdiction to a body of ground water. Federal regulation of ground water is covered in other statutes. See, e.g. 42 U.S.C. §§ 300h, 6949a(c), 9621(d)(2)(B)(ii). Two Seventh Circuit cases explain in greater detail why ground water is a limiting principle for the CWA. See United States v. Gerke Excavating, Inc., 412 F.3d 804, 807 (7th Cir.2005); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 965 (7th Cir.1994).

### 2. The Cross Street site

Prior to the Johnsons' activities, the Cross Street site contained an area of forested wetlands in the north and an area of grassy marsh and scrub-shrub wetlands in the south. The northern wetlands drained into an unnamed stream/ditch that flowed across the site and into Beaver Dam Brook. The southern wetlands were adjacent to Beaver Dam Brook and were part of a larger wetland area that stretches to South Meadow Brook. The southern wetlands drained into either Beaver Dam Brook or to South Meadow Brook. Beaver Dam Brook joins South Meadow Brook just south of the Cross Street site. Therefore, in summary, water from the Cross Street site drains into an unnamed stream/ditch, which in turn drains into another stream/ditch (Beaver Dam Brook and/or South Meadow Brook), which in turn flows into the navigable-in-fact Weweantic River.

### 3. The Fosdick Street site

The Fosdick Street site lies north of the Cross Street site. Prior to the Johnsons' activities, the site contained a shallow reservoir formed by the historic impoundment of the confluence of two unnamed streams, one perennial, the other intermittent. The site also contained forested wetlands along the two streams, and scrub-shrub wetlands near the reservoir. All of these wetlands drained into an unnamed perennial stream that flowed through cranberry bogs south of the reservoir and then into a pond. The pond drains through a channel to Rocky Meadow Brook, and then into the Weweantic River. Therefore, in summary, water from the Fosdick Street site flows from the wetlands into a stream, into another wetland, then into a pond, into a channel, into another stream (Rocky Meadow Brook), and finally into the navigable-in-fact Weweantic River.

### 4. The Forest/Fuller Street site

The Forest/Fuller Street site lies north of the Fosdick Street site. Prior to the Johnsons' activities, the site contained forested, shrub, and shrub/emergent wetlands, all surrounding an existing cranberry bog ("Bog A"). Bog A and the surrounding wetlands drain into an unnamed stream, which in turn flows into the Log Swamp Reservoir. From there, water moves through another bog system into a stream that travels through a wetland and into a pond. Water then flows from the pond through another bog system, and then into the Rocky Meadow Brook, which flows into the Weweantic. Therefore, in summary, water flows from the Forest/Fuller site through a stream, a reservoir, a bog, another stream, a wetland, a pond, another bog, a third stream (Rocky Meadow Brook), and then finally into the navigable-in-fact Weweantic River.

### 5. The Johnsons' activities

At various times between 1979 and 1999, the Johnsons and their agents discharged dredged and fill material at all three of the target sites in order to construct, expand, and maintain cranberry bogs. The Johnsons did not obtain permits from the Corps for these discharges pursuant to 33 U.S.C. § 1344. Defendants do not dispute their activities on the target sites, nor their failure to obtain a permit from the Corps for those activities.

### 6. The concurrence's reading of the record

The concurrence has a differing view of the hydrological connections between the target sites and the Weweantic River. The concurrence contends that "[n]o factual basis is presented by the EPA for the conclusion that either connecting system

[of waters] depends upon wetlands other than the target sites...." Therefore, in the concurrence's view, it is unnecessary to address the jurisdictional question raised by wetlands that form part of the hydrological connection between the target sites and the Weweantic River. Respectfully, both this opinion and the dissent disagree with this interpretation of the record.

The concurrence relies primarily on the EPA's description in its briefs on appeal of the hydrological connection between the target sites and the Weweantic River, and supplements the EPA's description with some quotations taken from the EPA's expert, Mr. Scott Horsley. The concurrence emphasizes the EPA's use of the phrase "flow through" to describe the movement of a stream through wetlands. In the view of the concurrence, this language means that the stream never loses its identity as a stream as it moves through wetlands. I do not believe that the record supports this interpretation.

Mr. Horsley describes the hydrological connection of the Forest/Fuller Street site as follows:

> The 1941 and 1949 maps show a hydrological connection from Bog A, with a channel which emptied into a finger-shaped swamp that jutted north from the Low Swamp Reservoir. The 1977 map shows a stream connecting the area of Bog A to the Log Swamp Reservoir. The 1977 USGS map shows that from the Log Swamp Reservoir, water flows south through another bog system, into a stream that travels through a wetland and into a pond. Water from this pond drains into another bog system, and becomes Rocky Meadow Brook.

This language describes a chain of waters that includes wetlands as well as streams and ponds. There is a "channel which emptied into a finger-shaped swamp". The channel does not cross or span the swamp. It empties into the swamp. "[F]rom the Log Swamp Reservoir, water flows south through another bog system, into a stream that travels through a wetland and into a pond." Water, not the "stream or channel", flows through another bog system and then into a stream. The stream is interrupted. The "stream [ ] travels through a wetland and into a pond. Water from this pond drains into another bog system, and becomes Rocky Meadow Brook." Again, the stream is interrupted by a pond, and the water enters another bog system before becoming Rocky Meadow Brook.

Although Mr. Horsley sometimes uses the phrase "flow through" to describe a stream traveling through a wetland, he also uses the phrase to describe water flowing through a bog system. Because Mr. Horsley attributes a variable meaning to the phrase "flow through", that phrase, when used by the EPA, does not have the singular meaning that the water at issue is always flowing as an identifiable stream. Sometimes it does flow in that fashion; sometimes it loses that identity and becomes diffuse water that drains through a wetland.

Mr. Horsley uses the "flow through" language to describe the hydrological connection for the Fosdick Street site as well. But because of the variable meaning attributed to "flow through", his use of the phrase does not permit the conclusion that the Fosdick Street site must have a hydrological connection that consists only of streams, creeks, and brooks—i.e. non-wetland waters—flowing through wetlands without losing their identity. The concurrence contends that a continuous blue line found on some of the maps "suggest[s] that the hydrological connections are through streams and brooks rather than diffused through wetlands." However, on some of the maps in the record, the thin blue line is actually identified as "drain-

age" and not a stream. According to Mr. Horsley's testimony, there is not an unbroken tributary connecting the Forest/Fuller Street site to the Weweantic River. Therefore, the blue line does not necessarily mean that the hydrological connections of the target sites are only through streams and brooks as the concurrence suggests.

Additionally, the concurrence contends that the EPA did not present to the district court the question raised by wetlands that form part of the hydrological connection between the target sites and the Weweantic River; and that the district court, by relying exclusively on the EPA's memorandum and evidence, did not address this question. However, as we have demonstrated by a close examination of the testimony of Mr. Horsley, the hydrological connection advanced by the EPA in the district court included these additional wetlands. Therefore, the jurisdictional issue raised by these additional wetlands was necessarily before the district court.

### D. Statutory and Regulatory Background

The government asserts jurisdiction over Defendants' actions on the target sites pursuant to the Clean Water Act.[5] Under § 301 and § 502 of the CWA, 33 U.S.C. § 1311 and § 1362, any discharge of dredged or fill material into "navigable waters"—defined in the Act as "waters of the United States"[6]—is forbidden unless authorized by a permit issued by the Corps pursuant to § 404 of the CWA, codified at 33 U.S.C. § 1344.[7] The EPA and the Corps are empowered by the CWA to develop regulations to implement the mandates of the CWA.[8]

In *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Court found that:

> [a]fter initially construing the Act to cover only waters navigable in fact, in 1975 the Corps issued interim final regulations redefining 'the Waters of the United States' to include not only actually navigable waters but also tributaries of such waters, interstate waters and their tributaries, and nonnavigable intrastate waters....

*Id.* at 123–24, 106 S.Ct. 455. The regulation at issue here has not significantly changed from the regulation issued in

---

**5.** The relevant portions of the Clean Water Act originated in the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816.

**6.** 33 U.S.C. § 1362(7) states that under the CWA, "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas."

**7.** 33 U.S.C. § 1344(a)—entitled "Discharge into navigable waters at specified disposal sites"—states in relevant part that: "The Secretary [of the Army, acting through the Chief of Engineers] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

**8.** The Corps regulation and the EPA regulation applicable to the Johnsons' property are identical. *See* 40 C.F.R. § 328.3(a); 40 C.F.R. § 230.3(s). The Corps and the EPA are jointly charged with enforcing the CWA. *See* 33 U.S.C. § 1344(s) and 33 U.S.C. §§ 1319(a)(3) & (b). Here, because the EPA brings this civil enforcement action against the Johnsons, not the Corps, the EPA's regulation is used for the analysis.

The two relevant Supreme Court decisions, *United States v. Riverside Bayview Homes, infra.,* and *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, infra.,* involved disputes arising from the Corps's enforcement of the CWA. Hence, these two decisions used the Corps' regulation in their analysis. That fact in no way diminishes the applicability of those cases to this case.

1975. This regulation, found at 40 C.F.R. § 230.3(EPA) [9], states in relevant part:

> For the purposes of this regulation these terms are defined as follows:
>
> (b) The term "adjacent" means bordering, contiguous, or neighboring....
>
> ...
>
> (s) The term "waters of the United States" means
>
> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
>
> (2) All interstate waters including interstate wetlands;
>
> (3) All other waters such as intrastate lakes, rivers, streams, (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
>
> (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
>
> (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>
> (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
>
> (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
>
> (5) Tributaries of waters identified in paragraphs (s)(1)-(4) of this section;
>
> (6) The territorial seas;
>
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1)-(6) of this section.

Sections (s)(1)-(s)(4) and (s)(6) are best understood as simultaneously stating the type of water over which the CWA has jurisdiction *and* providing the interstate or foreign rationale under the Commerce Clause for that jurisdiction. Sections (s)(1)-(s)(4) and (s)(6) each have what will be termed an "independent" rationale for jurisdiction. Sections (s)(5) and (s)(7), however, have what will be labeled a "derivative" rationale, meaning that there is no independent rationale justifying jurisdiction over waters described in (s)(5) and (s)(7). Jurisdiction over waters covered by (s)(5) and (s)(7) is valid only if the jurisdictional rationale for the water on which it is "piggybacking" is also valid. The government asserts jurisdiction here over the target sites via (s)(5), which extends jurisdiction over "tributaries", and (s)(7), which extends jurisdiction over "[w]etlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section."

For example, (s)(1) covers waters used in the past and present, and that could potentially be used, "in interstate or foreign commerce". Subsection (s)(1) establishes jurisdiction over navigable-in-fact waters and justifies jurisdiction with explicit reference to "interstate or foreign commerce", i.e. (s)(1) covers waters used as "channels of commerce". *See United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *The Daniel Ball,* 10 Wall. 557, 77 U.S. 557, 563, 19 L.Ed. 999 (1870) (stating that "[waters] are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water"). In the

---

9. The Corps version of this regulation is 33 C.F.R. § 328.3.

scheme established by § 230.3, the government's jurisdiction over waters described in (s)(5)(tributaries) and (s)(7)(wetlands adjacent) would derive from the government's jurisdiction over waters covered by (s)(1)(navigable-in-fact). In fact, this is precisely the rationale the government asserts here.

Certain terms in the text of § 230.3 emphasize this distinction between independent and derivative rationales. For instance, the word "tributary" as used in the regulation and navigability-in-fact are mutually exclusive. If § 230.3(s)(1) extends jurisdiction over navigable-in-fact waters, "tributaries" of such waters, discussed in (s)(5), cannot be navigable-in-fact. If a tributary were navigable-in-fact, jurisdiction over that particular water would be covered by (s)(1). Although in common usage a tributary could be navigable-in-fact—e.g. the Missouri River is a tributary of the Mississippi River—navigability-in-fact and "tributary" are not redundant bases for jurisdiction under the regulation.

In the same way that (s)(5) would be repetitive if "tributaries" were navigable-in-fact, (s)(7) is redundant unless "wetlands adjacent" are not "tributaries" as described in (s)(5) or navigable-in-fact waters as described in (s)(1). For example, if an (s)(7) "wetland adjacent" were navigable-in-fact, jurisdiction over that wetland would actually be covered by (s)(1). Section (s)(7) would be unnecessary. Similarly, if an (s)(7) wetland were a "tributary"

as covered by (s)(5), again, (s)(7) would be extraneous. Only if an (s)(7) "wetland adjacent" is categorically different from a navigable-in-fact water or an (s)(5) tributary does the inclusion of (s)(7) make sense.[10]

### E. Supreme Court Precedents

In addition to assessing the statutory and regulatory background, two Supreme Court decisions regarding the jurisdictional reach of the CWA must be considered: *Riverside* and *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) [hereinafter *SWANCC*]. Each party asserts that a Supreme Court precedent squarely disposes of this appeal. The government contends that *Riverside* resolves the matter of regulatory jurisdiction in its favor; Defendants assert that *SWANCC* resolves the jurisdictional question in their favor. These contentions are unpersuasive. Although each decision provides important guidance for resolution of this appeal, neither decision directly disposes of the questions concerning regulatory jurisdiction over the target sites.

### 1. *Riverside*

The Court's holding in *Riverside* begins with the recognition of a deference question. Citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

---

**10.** The district court states in its order denying Defendants' Motion for Reconsideration that "the three wetlands are hydrologically connected to the navigable Weweantic River by *nonnavigable tributaries*." (Emphasis added.) The concurrence takes the district court to mean that only tributaries, and no wetlands, comprise the hydrological connections of the target sites to the Weweantic River. The concurrence bases this interpretation of the district court's statement on its assumption—a correct one—that the district court

based its decision entirely on the EPA's position. But the concurrence, as already noted, incorrectly attributes to the EPA the position that no wetlands are part of the hydrological connections at issue here. The EPA's expert explained that there are wetlands involved in the hydrological connection. *That* is the EPA's position. Whatever the district court's language in the single dispositive sentence on the Motion for Reconsideration, it must necessarily have incorporated the presence of these additional wetlands into its conclusion.

104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court stated that:

> our review is limited to the question whether it is reasonable in light of the language, policies, and legislative history of the Act for the Corps to exercise jurisdiction over wetlands adjacent to ... rivers, streams, and other hydrographic features more conventionally identifiable as "waters."

*Riverside*, 474 U.S. at 131, 106 S.Ct. 455. The Court acknowledged that while the CWA used the term "navigable" to denote the reach of regulatory jurisdiction, its definition of "navigable waters" as "waters of the United States" extended jurisdiction over some waters that were not navigable-in-fact. *Id.* at 133, 106 S.Ct. 455. Hence, "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems suggests that it is reasonable for the Corps to interpret the term 'waters' to encompass wetlands adjacent to waters as more conventionally defined." *Id.* The Court concluded that:

> a definition of "waters of the United States" encompassing all wetlands adjacent to other bodies of water over which the Corps has jurisdiction is a permissible interpretation of the Act.

*Id.* at 135, 106 S.Ct. 455.

Relying on expansive language such as this, the government asserts that *Riverside* answers the question of whether jurisdiction over the target sites is valid. However, the government has uncoupled *Riverside's* holding from its facts. The property at issue in *Riverside* was "80 acres of low-lying, marshy land near the shores of Lake St. Clair in Macomb County, Michigan," *id.* at 124, 106 S.Ct. 455—a wetland adjacent to a navigable-in-fact water. Because the site at issue in *Riverside* was a wetland "that actually abuts on a navigable waterway," *id.* at 135, 106 S.Ct.

455, the Court never addressed the term "tributaries" as used in § 230.3(s)(5).

In the parlance used in the previous section, *Riverside* approves the independent rationale for jurisdiction provided in § 230.3(s)(1)—for navigable-in-fact waters. The *Riverside* court also approved jurisdiction over adjacent tributaries and wetlands, via (s)(5)(tributaries) and (s)(7)(wetlands adjacent), and the derivative rationale necessary to justify that extension of jurisdiction. Specifically, the Court approved an (s)(7)(wetlands adjacent) derivative rationale based on the independent rationale of (s)(1)(navigable-in-fact). By implication, this means that jurisdiction over an (s)(5) tributary adjacent to an (s)(1) water would also be valid. However, *Riverside* does not address the meaning or scope of the term "tributaries" as used in (s)(5), which is critical to this appeal.

### 2. *SWANCC*

The property at issue in *SWANCC* was "an abandoned sand and gravel pit in northern Illinois which provides habitat for migratory birds." 531 U.S. at 162, 121 S.Ct. 675. The Court described the property as "nonnavigable[-in-fact], isolated, intrastate waters" and "ponds that are *not* adjacent to open water". *Id.* at 166, 168, 121 S.Ct. 675 (original emphasis). The property at issue was not a navigable-in-fact water under (s)(1), a tributary of a navigable-in-fact water under (s)(5), or a wetland adjacent to either of these two categories of water under (s)(7).

The Corps had exerted federal jurisdiction over the ponds in *SWANCC* pursuant to subpart (b) of the "Migratory Bird Rule" (or the "Rule"), which the Corps issued to clarify the reach of its jurisdic-

tion under § 404(a) of the CWA.[11] The Migratory Bird Rule is the Corps' interpretation[12] of 33 C.F.R. § 328.3(a)(3)(1999).[13] Section 328.3(a)(3) states that jurisdiction of the CWA extends to:

> waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce. . . .

The Court held that "33 C.F.R. § 328.3(a)(3) (1999), as clarified and applied to petitioner's balefill site pursuant to the 'Migratory Bird Rule,' . . . exceeds the authority granted to [the Corps] under § 404(a) of the CWA." *SWANCC,* 531 U.S. at 174, 121 S.Ct. 675. As a result, any extensions of jurisdiction over waters that rely on the Migratory Bird Rule, including (s)(3)(intrastate) waters and (s)(5)(tributaries) and (s)(7)(wetlands adjacent) waters through a rationale derived via (s)(3), are invalid.

Defendants insist that *SWANCC* sharply curtails the reach of *Riverside,* which should be understood as creating an exception to the general rule that CWA jurisdic-

tion extends only to navigable-in-fact waters: "[t]he *Riverside Bayview* exception to the 'navigable waters' requirement only extends to nonnavigable waters that 'actually abut [ ] on a navigable waterway.'" Although they correctly characterize what *Riverside* directly addressed, Defendants misinterpret *Riverside* by conflating what *Riverside* held about CWA jurisdiction with the entirety of CWA jurisdiction. Put another way, Defendants incorrectly assert that *Riverside* constitutes the outer reach of the CWA.

Defendants base this misinterpretation of *Riverside's* holding on a misapprehension of the phrase "open water", a phrase the Court used in both *Riverside* and *SWANCC.* In a footnote discussing what it was *not* addressing, the *Riverside* court stated:

> we are not called upon to address the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of *open water, see* 33 C.F.R. §§ 323.2(a)(2) and (3) (1985), and we do not express any opinion on that question.

474 U.S. at 131, 106 S.Ct. 455 n. 8 (emphasis added).[14]

---

**11.** The Migratory Bird Rule states that § 404(a) jurisdiction extends to intrastate waters:

 a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

 b. Which are or would be used as habitat by other migratory birds which cross state lines; or

 c. Which are or would be used as habitat for endangered species; or

 d. Used to irrigate crops sold in interstate commerce.

Migratory Bird Rule, 51 Fed.Reg. 41206, 41217 (Nov., 13, 1986); *see also SWANCC,* 531 U.S. at 164, 121 S.Ct. 675.

**12.** "The Corps issued the 'Migratory Bird Rule' without following the notice and com-

ment procedures outlined in the Administrative Procedure Act, 5 U.S.C. § 553." *SWANCC,* 531 U.S. at 164, 121 S.Ct. 675 n. 1. As such, the Rule is best understood as an agency *interpretation* of an agency regulation, rather than an agency regulation. This fact becomes important when issues of deference to administrative agencies arise.

**13.** The parallel EPA regulation is 40 C.F.R. § 230.3(s)(3).

**14.** In *Riverside,* the Court addressed 33 C.F.R. § 323.2(a) (1985). Here, 40 C.F.R. § 230.3(s)(EPA) and 33 C.F.R. § 328.3(a)(Corps), which superceded § 323.2(a), are addressed. The language of the two regulations is virtually identical, as is

When the Court revisited *Riverside* in *SWANCC*, it stated that:

> our holding [in *Riverside* ] was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States." It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes*. Indeed, we did not "express any opinion" on the "question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of *open water*. . . ."

*SWANCC*, 531 U.S. at 167, 121 S.Ct. 675 (quoting *Riverside*, 474 U.S. at 131, 106 S.Ct. 455 n. 8.) (internal citations omitted) (emphasis added). Relying on this language from the two cases, Defendants have equated "open water" with navigabili-ty-in-fact. Based on this interpretation, Defendants assert in their brief that "as explained in *SWANCC*, Clean Water Act jurisdiction is limited to navigable[-in-fact] waters and those wetlands that abut and are 'inseparably bound up' with navigable[-in-fact] waters," i.e. jurisdiction under the CWA is limited only to (s)(1)(navigable-in-fact) waters and (s)(7) adjacent wetlands using (s)(1) for its derivative rationale.

However, Defendants overlook crucial language from *Riverside*. There, the Court states that "between *open waters* and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land." 474 U.S. at 132, 106 S.Ct. 455 (emphasis added). It is clear from this language that the *Riverside* court uses "open water" descriptively to distinguish rivers, lakes, streams, and similar bodies of water from those intermediate forms of partially wet, partially dry areas, i.e. wetlands, and from dry land. In short, "open water" means "wholly aquatic". It has nothing to do with navigability-in-fact.[15]

---

the regulatory scheme established by the two regulations. Therefore, the change in regulation has no effect on the reach of *Riverside*.

Section 323.2(a)(2) (1985) includes "[a]ll interstate waters including interstate wetlands." Section 323.2(a)(3) includes:

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travels for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce;

**15.** This concept of "open water" must be consistent with the understanding of how § 230.3 operates, i.e. the distinction between independent and derivative rationales. For them to be consistent, § 230.3 should incorporate the Court's concept of "open water". The regulation would demonstrate this consistency by distinguishing between types of open water, e.g. streams and creeks, that are and are not navigable-in-fact—which it does. While all navigable-in-fact waters are covered by (s)(1), § 230.3 contains sections that recognize non-navigable-in-fact "open water": (s)(3) ("rivers, streams (including intermittent streams)") and (s)(5) (not navigable-in-fact "tributaries"). The "open water" described in (s)(3)(intrastate waters) and (s)(5)(tributaries) is by definition not navigable-in-fact, based on the same redundancy reasoning used when the regulation was first introduced.

*SWANCC* does not establish *Riverside* as the limit of CWA jurisdiction over "waters of the United States". *SWANCC's* discussion of *Riverside* is aimed at distinguishing *Riverside* from *SWANCC*. At one point, the Court emphatically states that "[i]n order to rule for [the Corps] here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the text of the statute will not allow this." *SWANCC*, 531 U.S. at 168, 121 S.Ct. 675 (original emphasis). At other points, the Court uses the word "isolated" when referring to the ponds at issue. *See, e.g., id.* at 171, 121 S.Ct. 675. *SWANCC's* meaning in relation to *Riverside* is clear: jurisdiction over waters that are not "inseparably bound up with" navigable-in-fact waters, e.g. the ponds at issue in *SWANCC*, cannot find support in *Riverside*. This is the extent to which *SWANCC's* holding constrains *Riverside's*.[16] Put another way, *SWANCC* itself is best understood as establishing the outer boundary of CWA jurisdiction. But it does not directly address the type of waters at issue here.

Nevertheless, the language that *SWANCC* uses to describe this outer boundary of CWA jurisdiction over a particular water is important. As noted above, the Court stated:

> We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States." It was the significant nexus between the

wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes.*

*SWANCC*, 531 U.S. at 167, 121 S.Ct. 675 (citing *Riverside*, 474 U.S. at 131, 106 S.Ct. 455 n. 8.) (internal citations omitted). In order for the extension of CWA jurisdiction over wetlands, such as the target sites, to be valid, those wetlands must be "inseparably bound up with the waters of the United States," i.e. there must be a "significant nexus" between the target sites and a navigable-in-fact water. On the basis of *Riverside* and *SWANCC*, this opinion has rejected Defendants' assertion that these phrases—"inseparably bound up with" or "significant nexus"—require adjacency to a navigable-in-fact water. The target sites do not have that adjacency. Instead, they have a hydrological connection to a navigable-in-fact water. This opinion must now evaluate the government's jurisdictional assertion that this hydrological connection qualifies as a "significant nexus" within the meaning of *Riverside* and *SWANCC*.

## II.

### A. The *Deaton* decision and methodology

Navigation between *Riverside* and *SWANCC* requires an independent inquiry into the validity of regulatory jurisdiction over the target sites. The Fourth Circuit's decision in *United States v. Deaton*, 332 F.3d 698 (4th Cir.2003), provides helpful methodological and substantive guidance.[17] There, the property at issue was a

---

**16.** In this respect, this opinion respectfully disagrees with the Fifth Circuit's decisions in *In re Needham*, 354 F.3d 340 (5th Cir.2003), and *Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir.2001). These decisions interpret *SWANCC* in substantially the same manner as Defendants do, holding that *SWANCC* understands *Riverside* to constitute a mere excep-

tion that narrowly extends CWA jurisdiction to wetlands adjacent to navigable-in-fact waters.

**17.** Other circuits have gone so far as to adopt the reasoning of *Deaton* almost wholesale when confronted with similar factual circumstances. *See, e.g., Gerke Excavating, Inc.*, 412

wetland with a similar connection to a navigable-in-fact water;[18] also, the parties likewise had little or no dispute over the presence of a hydrological connection. *See id.* at 702.

As in *Deaton*, Defendants here argue that this court should not defer to the EPA's regulation or its administrative interpretation of it because § 230.3(s), as applied to the target sites, pushes the limits of congressional authority under the Commerce Clause and thereby raises serious constitutional questions. Thus, Defendants assert that § 230.3(s), as interpreted and applied to the target sites, cannot survive the threshold requirement described in *SWANCC*: "where an administrative interpretation of a statute invokes the outer limits of Congress' power," the interpretation is not entitled to deference under *Chevron* unless Congress gave "a clear indication that [it] intended that result." *SWANCC*, 531 U.S. at 172, 121 S.Ct. 675. According to Defendants, Congress never clearly stated its intention to use the CWA for the broad assertion of Commerce Clause authority at issue here and thereby reach wetlands so far removed from navigable-in-fact waters.

The "clear statement" rule that Defendants assert is a corollary to the doctrine of constitutional avoidance. This doctrine reflects a "prudential desire not to needlessly reach constitutional issues and [an] assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172–73, 121 S.Ct. 675. In *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), the Court held that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 575, 108 S.Ct. 1392.

However, the *Deaton* court concluded that this clear statement principle of constitutional avoidance set forth in *SWANCC* and *DeBartolo* had to be understood in light of the Court's holding in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). *See Deaton*, 332 F.3d at 705. In *Rust*, the Supreme Court decided the constitutionality of Department of Health and Human Services regulations promulgated in the wake of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), relating to the ability of federal fund recipients to engage in abortion-related activities. Confronting statutory and constitutional challenges to the regulations similar to the challenges in this case, the Court refused to circumscribe or invalidate the regulations to avoid ruling on the con-

F.3d at 804; *United States v. Rapanos*, 339 F.3d 447 (6th Cir.2003). As we explain above, Defendants present a statutory- and regulatory-based argument and a constitutional argument in favor of overturning the district court's decision. The *Deaton* court's methodology, which we follow here, was to answer the constitutional question first.

18. The *Deaton* court described the site as follows: "The parcel slopes gently downhill toward a country road, Morris Leonard Road. A drainage ditch runs alongside the road between the pavement and the Deatons' property.... The parties agree that surface water from the Deatons' property drains into the roadside ditch.... At the northwest edge of the Deaton's property, the roadside ditch drains into a culvert under Morris Leonard Road. On the other side of the road, the culvert drains into another ditch, known as the John Adkins Prong of Perdue Creek. Perdue Creek flows into Beaverdam Creek, a natural watercourse with several dams and ponds. Beaverdam Creek is a direct tributary of the Wicomico River, which is navigable." *Deaton*, 332 F.3d at 702.

stitutionality of the underlying statute. The Court offered this rationale for its rejection of constitutional avoidance:

> [t]he extensive litigation regarding governmental restrictions on abortion since our decision in *Roe v. Wade* ... suggests that it was likely that any set of regulations promulgated by the Secretary—other than the ones in force prior to 1988 and found by him to be relatively toothless and ineffectual—would be challenged on constitutional grounds. While we do not think that the constitutional arguments made by petitioners in these cases are without some force ... we hold that they do not carry the day. Applying the canon of construction [the doctrine of constitutional avoidance] under discussion as best we can, we hold that the regulations promulgated by the Secretary do not raise the sort of "grave and doubtful constitutional questions" ... that would lead us to assume Congress did not intend to authorize their issuance. Therefore, we need not invalidate the regulations in order to save the statute from unconstitutionality.

*Rust*, 500 U.S. at 191, 111 S.Ct. 1759 (internal citations omitted).

*Rust* creates an "exception" to the command to circumscribe the scope of regulations and related interpretations that arguably implicate the constitutionality of the underlying statutes, in those situations where "it [is] likely that any set of regulations promulgated by the [agency] ... would be challenged on constitutional grounds." 500 U.S. at 191, 111 S.Ct. 1759; *see also* Charles Alan Wright & Charles H. Koch, Jr., 33 Federal Practice and Procedure § 8363 (2006). *Rust* is a reminder that "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." 500 U.S. at 191, 111 S.Ct. 1759 (quoting *George Moore Ice Cream Co. v.*

*Rose*, 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933)). Constitutional avoidance under the aegis of the clear statement principle is not a neutral principle that simply defers difficult decisions on the validity of regulations without consequences. Application of the clear statement principle has the effect of rejecting the scope or validity of administrative regulations and interpretations in favor of circumscribed versions that seem to avoid constitutional challenges to the underlying statute. Without *Rust*, the unyielding application of the constitutional avoidance doctrine "would apparently make every rule invalid merely upon any constitutional challenge and, in fact, would prevent the resolution of many constitutional questions raised by a regulatory regime." Wright and Koch, 33 Federal Practice and Procedure § 8363.

For almost thirty years, the assertion of jurisdiction by the EPA and the Corps has gone beyond navigable-in-fact waters. Over that time, most challenges to the extension of CWA jurisdiction have raised constitutional questions, *see, e.g., Riverside*, 474 U.S. at 123, 106 S.Ct. 455, because the statute speaks of "navigable waters", making navigable-in-fact waters the only "safe" extension of jurisdiction, constitutionally speaking. However, to apply the doctrine of constitutional avoidance here in favor of the safe "navigation-in-fact" reading of the statute would ignore the CWA's text, which asserts jurisdiction beyond navigable-in-fact waters by defining "navigable waters" as "waters of the United States".

*Rust* allows us to assess the merits of the constitutional arguments against the government's interpretation and application of § 230.3(s) instead of invalidating the agency's action because of a reflexive adherence to the doctrine of constitutional avoidance. *See Deaton*, 332 F.3d at 705.

If this opinion concludes that these arguments do not "raise the sort of grave and doubtful constitutional questions that ... would lead us to assume Congress did not intend to authorize [the regulation's] issuance," *Rust,* 500 U.S. at 191, 111 S.Ct. 1759 (internal citations omitted), it may, as the *Deaton* court concluded, "proceed to the *Chevron* analysis." *Deaton,* 332 F.3d at 705. That is, with the specter of statutory unconstitutionality removed, familiar issues of deference to administrative regulations may then be addressed.

Therefore, the constitutional challenge posed by Defendants will be addressed first before proceeding to evaluate their claim that there is an inconsistency between the CWA and the regulation promulgated to give effect to the CWA and/or the EPA's interpretation and application of that regulation. Specifically, the remaining question is whether the Commerce Clause gives Congress the authority to enact legislation—the CWA—that extends jurisdiction over the tributaries and wetlands implicated by the EPA's extension of regulatory jurisdiction over the target sites.

## B. The constitutional question

■■■ Supreme Court jurisprudence has identified three broad categories of activity that Congress may properly regulate pursuant to the Commerce Clause:

First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce,

i.e., those activities that substantially affect interstate commerce.

*Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624 (internal citations omitted). Congress may regulate activities under the third category only if those activities are "economic in nature". *United States v. Morrison,* 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

The purpose of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Optimistically, it included the "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1). The EPA invokes this explicit statutory purpose and goal to support its assertion of jurisdiction over the wetlands involved in this case. In assessing the constitutional implications of this assertion (whether it raises grave and vexing constitutional questions), the Commerce Clause rationale for the CWA itself must be addressed. This will be done in two parts. First, the Fourth Circuit's persuasive approach to this question in *Deaton* will be summarized; second, the consistency of the *Deaton* court's approach with the Supreme Court's decisions in *Riverside* and *SWANCC* will be tested.

### 1. The *Deaton* court's Commerce Clause analysis

■■■ The *Deaton* court begins with two indisputable propositions: (1) Congress enacted the Clean Water Act under "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made," 332 F.3d at 706 (quoting *SWANCC,* 531 U.S. at 172, 121 S.Ct. 675); and (2) "[t]he power over navigable waters is an aspect of the authority to regulate channels of interstate commerce," *Deaton,* 332 F.3d at 706 (quoting *Gibbs v. Babbitt,* 214 F.3d 483, 490–91

(4th Cir.2000)). "Unlike its power to regulate activities with a substantial relation to interstate commerce, Congress's power over the channels of interstate commerce reaches beyond the regulation of activities that are purely economic in nature." *Deaton*, 332 F.3d at 706. Indeed, "the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained...." *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). *Caminetti* held that "barr[ing] the transport of any woman or girl in interstate channels for an immoral purpose was within congressional authority, even though the defendant's conduct—transporting a woman across state lines to be and become his mistress and concubine—was entirely noncommercial." *Deaton*, 332 F.3d at 706 (internal quotation marks and citations omitted). The *Deaton* court continued: "there is no reason to believe Congress has less power over navigable waters than over other interstate channels such as highways, which may be regulated to prevent their 'immoral and injurious use[ ].' " *Id.* at 707 (quoting *Caminetti*, 242 U.S. at 491, 37 S.Ct. 192). Such injurious uses would include the release of pollutants and fill material into non-navigable-in-fact waters. As the *Deaton* court points out, "[a]ny pollutant or fill material that degrades water quality in a tributary of navigable waters has the potential to move downstream and degrade the quality of the navigable waters themselves." 332 F.3d at 707.

The *Deaton* court concluded that "Congress's authority over the channels of commerce is thus broad enough to allow it to legislate, as it did in the Clean Water Act, to prevent the use of navigable waters for injurious purposes." *Id.* Faced with this reality, "Congress ... may decide that the aggregate effect of all of the individual instances of discharge ... justifies regulat-

ing each of them." *Id.* at 707 (citing *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). The *Deaton* court then adds these crucial points: "if Congress itself has the authority to make that decision, it may delegate it to the Corps, as long as it provides an 'intelligible principle' to guide the agency's decisionmaking." 332 F.3d at 707. In fact, "the Corps has pursued this goal by regulating non-navigable tributaries and their adjacent wetlands. This use of delegated authority is well within Congress's traditional power over navigable waters." *Id.* Thus, this assertion of jurisdiction by the Corps "does not invoke the outer limits of Congress's power or alter the federal-state framework." *Id.* at 708.

## 2. Testing the *Deaton* approach pursuant to the *Riverside/SWANCC* Commerce Clause analysis

The *Riverside* court assumed that the CWA was an appropriate exercise of Congress' commerce power because the Court reached the statutory question, validated regulatory jurisdiction over some waters that were not navigable-in-fact, and did not even mention the possibility that Congress had exceeded its power under the Commerce Clause. The *SWANCC* court, on the other hand, explicitly acknowledged the "channels of commerce" rationale for the CWA. It stated that "[t]he term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 172, 106 S.Ct. 455. As in *Riverside*, the Court does not question the CWA's constitutional validity insofar as the exercise of congressional authority springs from Congress' "traditional jurisdiction" over navigable-in-

fact waters, i.e. a "channels of commerce" rationale.

However, Congress did not enact the CWA simply to safeguard the navigability of the Nation's waters. Boats and ships can travel on polluted waters. Instead, as noted earlier, Congress designed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The *Riverside* court acknowledged the CWA's objective, which:

> incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, "the word 'integrity ... refers to a condition in which the natural structure and function of ecosystems is [are] maintained.'" H.R.Rep. No. 92–911, p. 76 (1972). Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for "[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source." S.Rep. No. 92–414, p. 77 (1972), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3742.

*Riverside*, 474 U.S. at 132, 106 S.Ct. 455. The Court's recognition of this congressional intent was critical to its approval of CWA jurisdiction in *Riverside*:

> [w]e are thus persuaded that the language, policies, and history of the Clean Water Act compel a finding that the Corps has acted reasonably in interpreting the Act to require permits for the discharge of fill material into wetlands adjacent to "waters of the United States."

*Id.* at 178, 106 S.Ct. 455.

In *SWANCC*, the Court re-affirmed its holding in *Riverside*—the finding of jurisdiction, the existence of a valid constitutional rationale justifying the assertion of jurisdiction, *and* Congress' purpose in creating the Clean Water Act:

> our holding [in *Riverside* ] was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States."

*SWANCC*, 531 U.S. at 167, 121 S.Ct. 675 (internal citation omitted) (quoting *Riverside*, 474 U.S. at 134, 106 S.Ct. 455). When the Court refers in *SWANCC* to a "significant nexus" between wetlands and "navigable waters", it is referring to wetlands that are "inseparably bound up with 'waters' of the United States." *Id.* Both *Riverside* and *SWANCC* confirm the validity under the Commerce Clause of the Clean Water Act's overriding purpose—"a concern for the protection of water quality and aquatic ecosystems." *Id.* In such ecosystems, as the *Deaton* court noted, "[a]ny pollutant or fill material that degrades water quality in a tributary of navigable waters has the potential to move downstream and degrade the quality of the navigable waters themselves." 332 F.3d at 707. In the words of the Supreme Court, such tributaries or wetlands are "inseparably bound up with waters of the United States." *Riverside*, 474 U.S. at 134, 106 S.Ct. 455 (internal quotation marks omitted).

The Court's approval in both *Riverside* and *SWANCC* of the CWA's express purpose "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), confirms that the *Deaton* court's analysis of the CWA as an exercise of Congress' power over "channels of commerce" is consis-

tent with those decisions. Pursuant to the Commerce Clause, Congress had the power in the CWA to prevent the injurious use of navigable waters by regulating the discharge of pollutants at their source. The CWA, and the agency regulations implementing the CWA, do *not* raise grave constitutional questions when justified on a "channels of commerce" rationale. The application of *Chevron* deference to the regulation does not require a clear statement from Congress that it intended to assert its full authority under the Commerce Clause when it enacted the CWA. As the *Deaton* court stated:

In sum, the Corps's regulatory interpretation of the term "waters of the United States" as encompassing nonnavigable tributaries of navigable waters does not invoke the outer limits of Congress's power....The agency's interpretation of the statute therefore does not present a serious constitutional question that would cause us to assume that Congress did not intend to authorize the regulation.

332 F.3d at 708.

What remains for decision in this appeal is precisely the type of question that the *SWANCC* court decided: is the regulation—and the interpretation of that regulation—promulgated by the EPA to implement the CWA a valid exercise of the authority delegated to the EPA by Congress, as it is applied by the EPA to the target sites? Thus posed, this question raises Defendants' statutory argument against the EPA's position in this case.

## C. The statutory question

The thrust of Defendants' statutory objection is this: even if the EPA could regulate the target sites without raising serious constitutional questions, the regulation as interpreted by the EPA is an unreasonable interpretation of the CWA.

This argument, posing questions about deference to administrative agencies, brings the discussion to *Chevron* and its two-part inquiry:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. 2778.

Under step one of *Chevron,* proceeding with this inquiry into Defendants' statutory- and regulatory-based objections requires us to determine whether the CWA directly resolves the question raised by extending jurisdiction over the target sites, or if the CWA is silent or ambiguous on that question. If Congress has been silent or ambiguous on the issue—thereby delegating to the EPA and the Corps the authority to give content to the phrase "waters of the United States"—the inquiry proceeds to the second step in the *Chevron* analysis—determining whether the agency's regulation extending jurisdiction to the particular waters at issue here reflects a reasonable construction of the statute.

The government, of course, asserts that regulatory jurisdiction over the target sites pursuant to § 230.3(s) represents a

proper exercise of Congress' Commerce Clause power, which Congress delegated to the EPA and the Corps. Specifically, in its brief, the government asserts jurisdiction over the waters at issue in this case by relying:

on the following three subsections of the regulatory definition of "waters of the United States": subsection (1), which refers, *inter alia*, to waters that have been or may be used in interstate commerce, including waters "subject to the ebb and flow of the tide" (i.e. traditional navigable waters); subsection (5), which refers, *inter alia*, to "[t]ributaries" of such traditional navigable waters; and subsection (7), which refers, *inter alia*, to "[w]etlands adjacent" to traditional navigable waters or their tributaries.

The government contends that the wetlands on the target sites are "wetlands adjacent" under § 230.3(s)(7); the open waters that comprise some of the segments connecting the target sites to the Weweantic River are all "tributaries" within the definition of § 230.3(s)(5); and the wetlands that comprise some of the segments linking the target sites to the Weweantic River are "wetlands adjacent" under § 230.3(s)(7); and the Weweantic River is covered by § 230.3(s)(1). In the parlance of this opinion, the government contends that there is an independent rationale for jurisdiction over the Weweantic River under (s)(1)(navigable-in-fact); there is a derivative rationale for jurisdiction over the open waters connecting the target sites to the Weweantic River via (s)(5)(tributaries); and there is a derivative rationale for jurisdiction over the target sites and the other wetlands in the chain of waters via (s)(7)(wetlands adjacent) via (s)(5)(tributaries) via (s)(1)(navigable-in-fact).

### 1. *Chevron*, step one

The exact question here is whether the CWA, by its terms, extends jurisdic-tion to distant, non-navigable tributaries of navigable-in-fact waters, and wetlands adjacent to those tributaries, such as the ones located on the target sites and in the chain of waters linking the target sites to the Weweantic River. As noted previously, 33 U.S.C. § 1344(a) defines "navigable waters" as "waters of the United States". Congress' definition does not limit jurisdiction to only navigable-in-fact waters.

Instead, Congress elected to move away from the traditional definition of "navigable waters" and expand the definition to "waters of the United States", which the Supreme Court in *Riverside* concluded was a strong indication that Congress intended to regulate at least some waters that were not navigable-in-fact. *See* 474 U.S. at 133, 106 S.Ct. 455. Observing that the CWA was passed pursuant to Congress' traditional reach over navigable-in-fact waters, *SWANCC* emphasizes that the CWA extends only to those non-navigable-in-fact waters that are "inseparably bound up with the 'waters' of the United States." 531 U.S. at 167, 121 S.Ct. 675. Nevertheless, even with the guidance from these two decisions, the phrase "waters of the United States" is ambiguous enough to constitute an implied delegation of authority to the EPA to administer the Act and make rules to fill the gaps within the confines of the CWA as outlined in *SWANCC*. *See Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (discussing delegation of congressional authority); *see also Deaton*, 332 F.3d at 709–10.

### 2. Regulation ambiguity and *Seminole Rock*

An additional step must be inserted in the *Chevron* analysis because Defendants have challenged the meaning of the agency regulation. The EPA interprets the regulation to cover the waters connecting the target sites to the Weweantic Riv-

er and the target sites themselves. Defendants assert that the agency interpretation is inconsistent with the words of the regulation. Because of this dispute, the actual meaning of the regulation must be determined before moving to the second step of *Chevron*. In such an analysis, the Supreme Court has stated the following:

Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions. But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ("Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." (Internal quotation marks omitted.)). This deference to an administrative agency's interpretation of its own regulations is known as *Seminole Rock* deference. If the regulation is unambiguous, *Seminole Rock* deference does not apply and the regulation's plain language controls. *See Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("The regulation in this case, however, is not ambiguous—it is plainly permissive. To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

■ The regulation at issue, § 230.3(s), defines "waters of the United States" to include "tributaries" of navigable-in-fact waters—through a derivative rationale of (s)(5)(tributaries) waters via (s)(1)(navigable-in-fact); and "wetlands adjacent" to navigable-in-fact waters and their tributaries—through a derivative rationale of (s)(7)(wetlands adjacent) waters via (s)(1) alone, or (s)(1) and (s)(5). Defendants assert that it is incorrect to read the regulation as reaching "any nonnavigable water with any hydrologic connection to a navigable[-in-fact] water, no matter how distant or infrequent the connection and regardless of the number of intervening, nonnavigable waters." Stated another way, Defendants contend "that it is wrong to read the regulation to reach all branches of a system that eventually flow into a navigable[-in-fact] waterway." *Deaton*, 332 F.3d at 710.

There is no dispute between the parties, and there is nothing in the record to the contrary, that the Weweantic River is obviously a navigable-in-fact water, and therefore is covered by § 230.3(s)(1). Similarly, there is no factual dispute that the target sites contain wetlands that are adjacent to tributaries that hydrologically connect those wetlands to the Weweantic River via a series of tributaries and adjacent wetlands. Since the EPA asserts jurisdiction over the wetlands on the target sites pursuant to (s)(7)(wetlands adjacent), which has a derivative rationale via (s)(5)(tributaries), the focus of the interpretive dispute is whether the term "tributaries" in § 230.3(s)(5) refers only to nonnavigable waters that empty *directly* into a navigable-in-fact water; or does "tributaries" include the waters that the target sites are adjacent to, and the bodies of open water that form part of the chain linking the target sites to the Weweantic River. In Defendants' parlance, is the connection be-

tween the target sites and the Weweantic River too attenuated?

In *Deaton,* the Fourth Circuit found conflicting definitions of "tributary" in two relatively contemporaneous versions of *Webster's* dictionaries. *Deaton,* 332 F.3d at 710–11. *Webster's Third New International Dictionary* (1993) defines "tributary" as "(1) providing with or serving as a channel for supplies or additional matter; or (2) one that is tributary to another: as ... a stream" (internal quotation marks omitted). By contrast, *Webster's II New Riverside University Dictionary* (1988) defines "tributary" as "[a] river or stream flowing into a larger river or stream." The former definition would encompass an interpretation of "tributary" as "tributary system", i.e. any body of *open water* with a "hydrological connection" is a tributary. Under this definition, a small, distant creek, whose water eventually made its way into the Missouri River, would be considered a "tributary" of the Mississippi River. Under the latter definition, the creek would only be considered a tributary of the Missouri River if it flowed directly into—i.e. was adjacent to—the Missouri.[19] It must be concluded, as the *Deaton* court did, that § 230.3(s)(5) is ambiguous on the question of how far the coverage of "tributaries" extends. *See Deaton,* 332 F.3d at 711.

Turning to the agency's interpretation, the government makes repeated use of the term "tributary system" throughout its brief. For example, the government emphasizes repeatedly that Defendants "make no effort to address the significance, as a class, of the present waters— *tributary systems* of navigable-in-fact waters and their adjacent wetlands—to downstream water quality." (Emphasis added.) There is no doubt that the government interprets "tributaries" in (s)(5) to mean "tributary system". The *Deaton* court speaks to the significance of all this:

> [a]lthough the Corps has not always chosen to regulate all tributaries, it has always used the word to mean the entire tributary system, that is, all of the streams whose water eventually flows into navigable waters. Because the Corps's longstanding interpretation of the word "tributary" has support in the dictionary and elsewhere, it is not plainly erroneous. Nor is it inconsistent with the regulation. The interpretation is therefore entitled to *Seminole Rock* deference. In short, the word "tributaries" in the regulation means what the Corps says it means.

*Deaton,* 332 F.3d at 710–11. This analysis is apt. The government has reasonably interpreted "tributaries" in (s)(5) to mean any body of *open water,* e.g. a stream or creek, hydrologically connected to a navigable-in-fact water. This also means that a "tributary system" need not be a contiguous series of open waters, but may be interrupted by waters such as wetlands.[20]

---

**19.** Further inquiry into other sources does not make either definition of "tributary" more plausible. The *American Heritage Dictionary,* (4th ed.2000) defines tributary as "a stream that flows into a larger stream or other body of water." On the other hand, the *Oxford English Dictionary,* (2d ed.1989) defines tributary as "[a] stream contributing its flow to a larger stream or lake; an affluent, feeder." This latter definition could plausibly accommodate either a "tributary system"/"any hy-

drological connection" or a "direct connection only" interpretation.

**20.** Contrary to the insistence of the concurrence, the opinion does not interpret "tributary system" to include other wetlands. "Tributary" is a term the regulation uses to address only open waters, such as rivers, lakes, and streams. This is why the regulation allows for a "tributary system" to be "interrupted" by intervening wetlands. Moreover, jurisdiction over these intervening

### 3. *Chevron,* step two

 With the ambiguity in the meaning of the regulation resolved, the second step of the *Chevron* analysis can proceed: is the regulation "based on a permissible construction" of the CWA? 467 U .S. at 843, 104 S.Ct. 2778; *see also Deaton,* 332 F.3d at 711. Defendants assert that *SWANCC* establishes *Riverside* (which approved of CWA jurisdiction over (s)(7) adjacent wetlands via a derivative rationale from an (s)(1) water) as the outer bound of CWA jurisdiction—an interpretation of *SWANCC* that this opinion has already rejected. The conclusion in step one of the *Chevron* inquiry, finding that there is ambiguity in the CWA, means that Congress intended to delegate authority to the EPA to decide how far coverage must extend to protect the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Moreover, we decided, not long after the Court's decision in *Riverside,* that "Congress intended said term [navigable waters] to be given 'the broadest constitutional interpretation.' " *United States v. Rivera Torres,* 826 F.2d 151, 154 (1st Cir.1987) (citing Conference Report on Section 2770, reprinted in 1 *A Legislative History of the Water Pollution Control Act Amendments of 1972,* at 178). This appeal deals with an extension of CWA jurisdiction premised on a "channels of commerce" rationale, which the *Riverside* and *SWANCC* courts endorsed. An agency interpretation of the CWA that falls within the bounds established by

these two decisions would be a reasonable and permissible one.

In *Riverside,* the Court concluded that the Corps' extension of CWA jurisdiction over "all wetlands adjacent to other bodies of water over which the Corps has jurisdiction is a permissible interpretation of the [CWA]." 474 U.S. at 135, 106 S.Ct. 455. Citing congressional findings, the *Riverside* court highlighted the reality that "[p]rotection of aquatic ecosystems ... demanded broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.' " *Id.* at 132, 106 S.Ct. 455 (quoting S.Rep. No. 92–414 at 77 (1927), reprinted in 1972 U.S.C.C.A.N. 3668, 3742). *SWANCC* confirmed this holding in part because of Congress' intent "to regulate wetlands inseparably bound up with the waters of the United States" and "the significant nexus between the wetlands and 'navigable waters.' " 531 U.S. at 167, 121 S.Ct. 675 (internal citations omitted); *see also Deaton,* 332 F.3d at 712.

The government has asserted that discharges into a tributary system and wetlands adjacent to rivers, streams, and other types of open water that comprise the tributary system of a navigable-in-fact water, i.e. waters that have a hydrological connection to a navigable-in-fact water, have a substantial effect on water quality in that navigable-in-fact water. There is a "significant nexus" between a navigable-in-fact water and the tributary system that drains into it. Here, the government has

wetlands is not asserted via (s)(5) and an expansive definition of "tributary system". Instead, jurisdiction over these wetlands is asserted via (s)(7), because those wetlands, as well as the target sites, are adjacent to segments of an (s)(5) tributary system.

The concurrence concludes that "the EPA did not interpret subpart (s)(5) to include other wetlands as part of the tributary systems

that constitute the hydrological connections between the target sites and the [Weweantic River]...." I agree with this statement. As already emphasized (in Section II.C), any additional wetlands that constitute part of the hydrological connections between the target sites and the Weweantic River are covered by subpart (s)(7).

provided undisputed evidence that hydrological connections exist between the target sites and the Weweantic River. Therefore, there is a significant nexus between the target sites and the Weweantic River; the target sites are inseparably bound up with the Weweantic River. Given this connection and Congress' broad delegation of authority under the CWA, the government has reasonably and permissibly interpreted the CWA to extend jurisdiction over the entire tributary system—and wetlands adjacent to that tributary system—of a navigable-in-fact water.

### III.

■ These are the principal conclusions set forth in this opinion. Although the Supreme Court precedents invoked by the parties in support of their positions, *Riverside* and *SWANCC*, did not control the outcome of this case, they provided important guidance on the jurisdictional question at issue. Contrary to the assertion by Defendants, the doctrine of constitutional avoidance did not require invalidating the application of the EPA's regulations to the target sites. Instead, this opinion assessed the merits of their constitutional challenge to the application of the Clean Water Act to the target sites before assessing their statutory and regulatory challenges. Based on the Fourth Circuit's reasoning in *Deaton*, and the consistency of that reasoning with the Supreme Court's decisions in *Riverside* and *SWANCC*, it was concluded that the extension of jurisdiction to the target sites, justified on the basis of a "channels of commerce" rationale, fell safely within Congress' power under the Commerce Clause.

Moving to the Johnsons' statutory- and regulatory-based arguments, this opinion applied the two-step *Chevron* inquiry. It was concluded, first, that the CWA was silent on the particular question of whether jurisdiction could be extended to the target sites and the waters connecting the target sites to the Weweantic River, which constituted a delegation of authority by Congress to the EPA and the Corps to fill that gap. Second, because the meaning of the word "tributaries" in § 230.3(s)(5) was uncertain, an additional step was necessary to resolve this definitional ambiguity before proceeding to *Chevron's* second step. On the basis of *Seminole Rock*, the EPA's interpretation of "tributaries" as "tributary system" was entitled to deference. Finally, with the meaning of the regulation settled, the analysis could proceed to the second step of *Chevron*, concluding that the EPA's interpretation of § 230.3(s) and its application to extend jurisdiction over the target sites reflects a permissible, reasonable interpretation of the CWA.

In the end, there is a striking harmony between the legal doctrines that guide the jurisdictional analysis in this case and the physical realities that underlie the dispute. The unwavering constant that threads its way through the Clean Water Act, *Deaton*, *Riverside*, *SWANCC*, and this decision is the recognition that "Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands inseparably bound up with the waters of the United States." *SWANCC*, 531 U.S. at 167, 121 S.Ct. 675 (internal quotation marks omitted). Here, the target sites are inseparably bound up with the navigable-in-fact Weweantic River because of the uncontested fact that there is a hydrological connection—through a tributary system and its adjacent wetlands—linking them together. The district court's decision that the Clean Water Act's jurisdiction extends to the target sites is *affirmed*.

*So ordered.*

DICLERICO, District Judge, concurring in part and concurring in the judgment.

I concur with the result reached by Judge Lipez in his opinion (hereinafter "the opinion"), affirming the district court's decision that Clean Water Act jurisdiction extends to the target sites involved in this case. However, I do so based on an interpretation of the record that differs from that of the opinion. Consequently, I must respectfully disagree with some of the opinion's reasoning in support of the result. I come to the same result based, in part, on different reasoning.

I interpret the record to support the conclusion that there is a hydrological connection, which constitutes a significant nexus, between each of the three target sites and the Weweantic River. Because each of the sites has a significant nexus through a hydrological connection with a navigable-in-fact water, the Commerce Clause supports CWA jurisdiction over the sites. I disagree, however, with the opinion's interpretation of the record to the extent it is based on a theory that the connection between each target site and the river depends upon diffusion of water through wetlands, other than the target sites themselves, either as part of the connecting "tributary system" or as a link or links in a series of "tributary systems."[21] I further disagree with the opinion's rea-

soning that the EPA's regulation, 40 C.F.R. § 230.3(s), can be reasonably interpreted to include other wetlands as part of the "tributary systems" that constitute the hydrological connections to the Weweantic River. As I view the record, the hydrological connections that are pertinent to the EPA's regulation do not include other wetlands, but instead are composed in each case of a system of tributaries from the target site to the river, although some of the connecting tributaries flow through other wetlands or bogs.

In my view, because the record does not support the opinion's description of the hydrological connections between the Fosdick Street and Forest/Fuller Street sites and the river, the issue of whether the regulation can reasonably be interpreted to cover that circumstance need not and should not be reached or decided in this case. That issue was not raised before or addressed by the district court. On appeal, the issue was raised only belatedly, and in a perfunctory manner, and was not addressed by the EPA.[22]

The EPA describes the connection from the Johnsons' Fosdick Street site to the Weweantic River as follows: "All of these wetlands drained into an unnamed *perennial stream that flowed through* cranberry bogs south of the reservoir and then into a pond at Maxim Corner. The pond drains through a channel to Rocky Meadow Brook, approximately one mile upstream

---

**21.** There is no disagreement over the fact that the "tributary system" connecting the Cross Street site to the Weweantic River does not include other wetlands within the connecting system. There is disagreement as to the components of the systems that connect the Fosdick Street and Forest/Fuller sites to the river.

**22.** Based on the opinion's interpretation of the record, whether the EPA's regulation, § 230.3(s), would extend the CWA to wetlands as described in the opinion is an important issue that had to be addressed.

However, because the issue was not raised or addressed below, this court did not have the benefit of the EPA's position. In my view, the case should have been remanded to the district court for development and clarification of that issue. In particular, the EPA should have been given the opportunity, in the first instance, to address the interpretation of its own regulation in the context of the record as interpreted in the opinion. However, my colleagues did not agree to a remand.

from the start of the Weweantic River." (Citations omitted, and emphasis added.) The EPA describes the Forest/Fuller Street site connection as follows: "Bog A and the surrounding wetlands drain via an unnamed stream into the Log Swamp Reservoir on the southern side of the site. The Log Swamp Reservoir drains into a *stream that flows through* a continuous series of bogs, wetlands, and ponds, before becoming the Rocky Meadow Brook." (Citations omitted, and emphasis added).

The components of the "tributary systems" that constitute the hydrological connections between the Fosdick Street and Forest/Fuller Street sites and the river are described by the EPA as streams, ponds, and brooks, with an additional channel for the Fosdick Street site. No factual basis is presented by the EPA for the conclusion that either connecting system depends upon wetlands other than the target sites, as the connections are described in the opinion, and the EPA has not presented an argument to this effect. Importantly, the district court relied on the EPA's memorandum and the EPA's evidence presented in support of its motion for summary judgment and concluded that "there is a sufficient basis for the United States to exercise jurisdiction because the undisputed evidence shows that the three wetlands are hydrologically connected to the navigable Weweantic River *by nonnavigable tributaries.*" Based on the EPA's evidence and its theory of the case, the district court concluded that the connections from the sites to the river were through tributaries, *not* through other wetlands or bogs.[23]

The EPA's hydrology expert, Scott Horsley, described the connection between the Fosdick Street site and the river as "a perennial stream," which ran through bogs to the pond at Maxim Corner. Horsley's description of the connection between the Forest/Fuller Street site and the river, taken by itself, might be interpreted to include "bog systems" within that connecting series. However, the map of all three sites, which Horsley prepared, depicts a continuous blue line from each site to the river, suggesting that the hydrological connections are through streams and brooks rather than diffused through wetlands. More importantly, the EPA interpreted Horsley's opinion to mean that the connection is "a stream that flows through a continuous series of bogs, wetlands, and ponds, before becoming Rocky Meadow Brook." The district court relied on the EPA's interpretation, and the Johnsons do not dispute it.

In this circumstance, where the district court adopted the EPA's interpretation of the evidence and where the Johnsons do not dispute the EPA's interpretation, that interpretation, in my opinion, must control. Because, as I view the record, the EPA does not include wetlands as part of the connecting series constituting a "tributary system," we need not resolve the difficult question of whether the EPA's regulation could properly extend its jurisdiction to a wetland site connected to a navigable-in-fact river through a system of waters that includes other wetlands.

If I had interpreted the record to show that the hydrological connections for the target sites were dependent on other wetlands, meaning other wetlands within the

---

**23.** The opinion interprets the EPA's regulation, § 230.3(s), to define "tributary" and "wetland" as mutually exclusive waters: if a water is a tributary, it is not a wetland and vice versa. Under this interpretation, there-

fore, because the district court found the sites were connected to the river by *tributaries,* the connections necessarily do not include wetlands.

tributary systems as described in the opinion, I would have joined the dissent on that issue. However, in the absence of other wetlands within the connecting "tributary systems," the issue does not arise in this case. For that reason, I respectfully refrain from joining in the opinion to the extent that it describes the connections between the target sites and the river to include wetlands other than the target sites and to the extent that it holds that the EPA reasonably interpreted subpart (s)(5) to mean "tributary systems" which include other wetlands either as part of a tributary system or as links along a series of tributary systems.

Because I conclude that the EPA did not interpret subpart (s)(5) to include other wetlands as part of the tributary systems that constitute the hydrological connections between the target sites and the river, I concur that the EPA has reasonably interpreted its regulation in the context of this case, albeit based on my interpretation of the record. In all other respects, I concur with the reasoning and conclusions in the opinion.

TORRUELLA, Circuit Judge (dissenting).

The majority today holds that the term "navigable waters," as used in the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, includes any nonnavigable waters that are "hydrologically connected" to a navigable-in-fact water. This interpretation—which will vastly expand the federal government's power to regulate private landowners such as the defendants in this case—goes well beyond the intention of Congress in enacting the CWA and expands the government's powers beyond those authorized by the United States Constitution. Further, the government's assertion of jurisdiction over the Johnsons'

wetlands conflicts with its own regulations. I therefore dissent.

## I.

In *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court unanimously held that the government may assert jurisdiction over wetlands adjacent to navigable-in-fact waters. Noting that Congress had defined "navigable waters" in the CWA as "waters of the United States," the Court stated that "Congress chose to define the waters covered by the Act broadly" and "the term 'navigable' as used in the Act is of limited import." *Riverside Bayview,* 474 U.S. at 133, 106 S.Ct. 455. It is thus settled that wetlands actually abutting a navigable-in-fact water are "waters of the United States" over which the government may assert jurisdiction.

However, *Riverside Bayview*—which did not address wetlands adjacent to a series of nonnavigable waters that eventually make their way into navigable-in-fact waters—must be read in light of the Supreme Court's more recent opinion in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (*"SWANCC"*). While *SWANCC*—which involved "an abandoned sand and gravel pit" that had no hydrological connection to a navigable-in-fact water, *id.* at 162, 121 S.Ct. 675—is not dispositive of the present case, the Court's discussion in *SWANCC* is important.

The *SWANCC* Court stated that its holding in *Riverside Bayview* was based in large part on "the significant nexus between the wetlands and 'navigable waters' " and the Court's finding that Congress had "indicated its intent to regulate wetlands 'inseparably bound up with the 'waters' of the United States.' " *Id.* at 167, 121 S.Ct. 675 (quoting *Riverside Bayview,*

474 U.S. at 134, 106 S.Ct. 455). The Court also noted that the CWA was enacted under Congress's "traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 172, 106 S.Ct. 455. Perhaps most importantly, the Court stated that, while the term "navigable" is of limited import, "it is one thing to give a word limited effect and quite another to give it no effect whatever." *Id.*

Unfortunately, the majority's decision today does just that. Under the "any hydrological connection" test, *any* water that is hydrologically connected to a navigable-in-fact water is by definition "inseparably bound up with" waters of the United States and thus under the government's control. This is the case regardless of how many nonnavigable waters separate the wetland from navigable-in-fact waters, or the distance between the wetland and navigable-in-fact waters. Under the majority's test, a wetland that is separated from a navigable-in-fact water by hundreds of miles would fall under the government's jurisdiction as long as it is hydrologically connected.

Further, although the majority is careful to state that "[n]othing in the terms of the CWA or the regulation at issue here interpreting the CWA could be construed as extending jurisdiction to a body of ground water," there is nothing in the "any hydrological connection" test that would theoretically prevent the EPA from asserting jurisdiction over ground water that is hydrologically connected to a navigable-in-fact water. In other words, the only reason the majority gives for its statement that the CWA does not cover ground water is that the CWA does not cover ground water. Aside from this tau-

tology, there is nothing in the "any hydrological connection" test that would prevent the government from asserting jurisdiction over ground waters.[24] Further, given the majority's repeated emphasis on the broad purposes of the CWA, it would seem odd not to include in the government's jurisdiction ground waters hydrologically connected to navigable-in-fact waters. After all, if the reason the majority is adopting the "any hydrological connection" test is that water moves in "hydrologic cycles" such that any waters hydrologically connected to navigable-in-fact waters are by definition inseparably bound up with those navigable-in-fact waters, then why should the fact that connections occur below, as opposed to above, the ground matter?

The obvious explanation for the majority's insistence that the "any hydrological connection" test does not include ground waters is that the inclusion of ground waters would raise even more serious constitutional problems than the inclusion of surface waters does. But even assuming that the "any hydrological connection" test covers only surface waters, it still raises serious constitutional questions, and we therefore should construe the CWA "to avoid such problems unless such construction is plainly contrary to the intent of Congress." *SWANCC,* 531 U.S. at 173, 121 S.Ct. 675 (internal quotation marks and citation omitted); *see also In re Needham,* 354 F.3d 340, 345 (5th Cir.2003) (holding that the CWA does not "permit the federal government to impose regulations over 'tributaries' that are neither themselves navigable nor truly adjacent to navigable waters").

As the majority notes, the Supreme Court has articulated three categories of activities Congress may regulate under the

---

**24.** In fact, several federal courts have already found that the CWA *does* include ground water that is hydrologically connected to a navi-

gable-in-fact water. *See Idaho Rural Council v. Bosma,* 143 F.Supp.2d 1169, 1179–80 (D.Idaho 2001) (collecting cases).

Commerce Clause: (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities that substantially affect interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *SWANCC*, the Court was dealing with an argument by the government that the "Migratory Bird Rule" fell "within Congress' power to regulate intrastate activities that 'substantially affect' interstate commerce." 531 U.S. at 173, 121 S.Ct. 675. The Court found that such "substantial effects" justifications for the CWA raised serious constitutional issues and decided that, in the absence of a clear statement from Congress, it would construe the CWA to avoid such questions.

The majority, in order to avoid this problem, attempts to characterize the assertion of jurisdiction over the Johnsons' wetlands as a valid exercise of Congress's Commerce Clause powers over the "channels of commerce." According to the majority, since Congress may validly regulate "channels of commerce"—which would include navigable-in-fact waters—it may validly regulate the Johnsons' wetlands in order to protect the channel of commerce involved here. In making this point, the majority analogizes to Congress's power to regulate interstate highways. However, Johnsons' wetlands are not analogous to interstate highways. What would be analogous to a highway is the navigable-in-fact Weweantic River. The Johnsons' wetlands are more akin to a dirt footpath on private property that connects to a private dirt road that connects to a small local road that connects to a state highway. I seriously doubt whether Congress could validly regulate such a dirt footpath under a "channels of commerce" rationale; in the same manner, Congress cannot regulate

the Johnsons' wetlands under a "channels of commerce" rationale.

The fact is that the wetlands at issue here are not channels of commerce. What the majority is concerned about are the aggregate affects that pollution of distant wetlands may have on navigable-in-fact waters. This falls under the third category of what Congress may regulate under the Commerce Clause: activities that substantially affect interstate commerce. The Seventh Circuit appears to have recently recognized as much, even though it reached a result with which I disagree. In *United States v. Gerke Excavating, Inc.*, 412 F.3d 804 (7th Cir.2005), the defendant had filled a 5.8 acre tract containing some wetlands that were hydrologically connected to a navigable-in-fact water. The court reasoned that, although the filling of the wetlands would probably not have a measurable effect on the navigable-in-fact water, "[the sum of many small interferences with commerce can be large, and so to protect commerce Congress must be able to regulate an entire class of acts if the class affects commerce, even if no individual act has a perceptible effect.]" *Id.* at 806. In sum, although the majority attempts to characterize the regulation of these wetlands as part of Congress' power to regulate channels of commerce, this type of regulation more properly falls under the substantial effects category articulated in *Lopez*. Just as in *SWANCC*, evaluating whether the activities here have a substantial effect on interstate commerce would raise serious constitutional questions. Because Congress has not provided a clear statement indicating that it intended the CWA to reach wetlands like the ones at issue here, the EPA's interpretation should not be accorded deference. *See In re Needham*, 354 F.3d at 346 n. 8.

In concluding this section, I wish to emphasize that I understand Congress's

broad purpose in enacting the CWA, as well as the importance of wetlands to the quality of our nation's waters. However, there are other interests that must be considered when dealing with these issues, including the livelihood of people in the Johnsons' position and the federal-state framework involved in water conservation. Congress has recognized that the States have "the primary responsibilities and rights ... to prevent, reduce, and eliminate pollution" and to "to plan the development and use of ... water resources." 33 U.S.C. § 1251(b). Today's decision goes too far in recognizing the former interests at the expense of the latter. The federal government simply may not constitutionally regulate wetlands "that are neither themselves navigable nor truly adjacent to navigable waters." *In re Needham*, 354 F.3d at 345.[25]

## II.

Even if I were inclined to agree with the majority's conclusions under the "any hydrological connection" test, I would still dissent because the government's attempt to assert jurisdiction over the Johnsons' wetlands is inconsistent with its own regulations. Courts will not give an agency's interpretation of its regulations deference when that interpretation is inconsistent with the regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

The applicable regulations state that "waters of the United States" include "[w]etlands adjacent to waters (*other than waters that are themselves wetlands*) identified in paragraphs (s)(1) through (6) of this section." 40 C.F.R. § 230.3(s)(7) (emphasis added). The government asserts jurisdiction over the Johnsons' wetlands by claiming that they are adjacent to nonnavigable tributaries of the Weweantic River. *See id.* § 230.3(s)(5) and (7). The government's theory—with which the majority agrees—is that "tributaries" as defined in Section 230.3(s)(5) means "tributary system."[26] However, it is undisputed that, for all of the wetlands at issue here, the "tributary system" to which they are adjacent includes *other wetlands*. The government is thus attempting to assert jurisdiction over wetlands adjacent to other waters that are themselves wetlands, in contravention of its own regulations. We therefore should not accord deference to the government's interpretation and should find that the government does not have jurisdiction over the Johnsons' wetlands.

The majority's attempt to circumvent this problem is unpersuasive. The majority states that

> a wetland remains a "water of the United States" so long as it is also adjacent to a body of water that is a "water of the United States" that is not a wetland. Here, each target site

**25.** Although *In re Needham* was dealing with tributaries as opposed to wetlands, the principle for which it stands applies with full force to the Johnsons' wetlands.

**26.** In its opinion, the majority acknowledge a dispute between the parties as to the definition of "tributaries." The majority states that the focus of the interpretive dispute is whether the term 'tributaries' ... refers only to nonnavigable waters that empty directly into a navigable-in-fact water; or does 'tributaries' include the waters that the

target sites are adjacent to, and the bodies of open water that form part of the chain linking the target sites to the Weweantic River [i.e., the entire "tributary system" of the Weweantic River].

The majority chooses the latter definition, as it must, because under the former definition, the government could not assert jurisdiction over the Johnsons' wetlands since the streams to which they are immediately adjacent do not empty directly into the Weweantic River.

is *immediately adjacent* to at least one (s)(5) tributary; and every wetland found in the chain of waters connecting the target sites to the Weweantic River is also adjacent to at least one (s)(5) tributary.

(emphasis added). However, it does not matter where in the chain of connections the other wetlands occur or what the Johnsons' wetlands are "immediately adjacent" to. Under the government's theory, the Johnsons' wetlands are adjacent to the entire "tributary system" between the wetlands and the Weweantic River because of the hydrological connection that exists. This tributary system includes other wetlands. Section 230.3(s)(7) plainly states that wetlands adjacent to waters that are themselves wetlands are not covered by the regulations. It says nothing about "immediate adjacency," nor does it matter whether these other wetlands would themselves be considered "waters of the United States."

In short, the majority cannot have it both ways. Either "tributaries" means only waters that flow directly into a navigable-in-fact water, in which case the government could not assert jurisdiction over the Johnsons' wetlands, or "tributaries" means "tributary system," in which case the government cannot assert jurisdiction over the Johnsons' wetlands because the tributary system they are adjacent to includes other wetlands. Because the government's assertion of jurisdiction contradicts its own regulations, we should find in favor of the Johnsons.

### III.

The majority's opinion today greatly increases the power of the federal government to regulate the use of waters on private property. It allows the government to go far beyond what Congress intended in enacting the CWA and also raises seri-

ous constitutional issues regarding Congress's power under the Commerce Clause. Further, the majority ignores the fact that the government's assertion of jurisdiction is inconsistent with its own regulations. For these reasons, I respectfully dissent.